HUTCHINSON (UNITED STATES v.). See Case No. 15,431.

HUTCHINSON (WHIPPLE v.). See Case No. 17,517.

HUTCHINSON (UNITED STATES v.). See Case No. 15,432.

———

## Case No. 6,959.

### HUTSON v. JORDAN et al.

[1 Ware (385) 393;[1] 18 Am. Jur. 294.]

District Court, D. Maine. June Term, 1837.

ADMIRALTY—PRACTICE—FORM OF LIBEL—ANSWER.

1. In the admiralty, the libellant is required to verify the debt or cause of action on which a libel is founded, by his oath.

2. In like manner the respondent is required to verify his answer by oath.

3. There is no rule in the admiralty like that in equity, which precludes the court from making a decree, against a denial by the answer of any matter alleged in the libel, unless it is disproved by two witnesses.

[Cited in Jay v. Almy, Case No. 7,236; The Moslem, Id. 9,876.]

4. How far the answer in the admiralty is considered evidence.

[Cited in Cushman v. Ryan, Case No. 3,515; Havermeyer's & Elder Sugar Refining Co. v. Campania Transatlantica Espanola. 43 Fed. 91.]

This was a libel for an assault and battery, by a seaman against the master and mate. The facts in the case, as well as the grounds taken by the counsel, in the argument, are fully stated in the opinion of the court.

———

[1] [Reported by Hon. Ashur Ware, District Judge.]

Mr. Haines, for libellant.
C. S. Daveis, for respondent.

WARE, District Judge. This is a libel for a marine trespass. The libel alleges a joint assault by the master and the mate. The assault is admitted by the mate in his answer, and is fully proved by the witnesses, though not with all the aggravating circumstances stated in the libel. It was not only severe, but at the particular time when it took place, it was without provocation, and is clearly a case for damages.

The case of the master requires more consideration. Hutson, in his libel, states that while the mate was pursuing him on the deck, and flogging him with a cow-skin, he fled to the companion-way and called on the master, who was in the cabin, to protect him; that the master, instead of interposing for his protection, ordered the mate to take him forward and flog him. If the facts were proved as alleged, I should feel no difficulty, on the supposition that there was no justifiable cause for punishment, in holding the master jointly responsible for the assault. The law vests in the master the whole authority for the government of the crew, and for the maintenance of discipline on board the vessel. The inferior officers are subject to his control, and bound as well as the men to execute his orders, and if any inflict punishment by his command, the act is considered as his. But the master is bound also to protect his men against the oppression and cruelty of his subordinate officers, and if he permits them to be abused, without interposing for their protection, the just inference is, that he authorizes the act of his subordinates, and he becomes legally a party to it. But the allegation, in the material part of it, is directly contradicted by the master in his answer. He denies that he had any knowledge of the assault of the mate, until it was ended. He says, that "hearing a sudden noise on deck, he went to the companion-way, where he saw Hutson with the mate having hold of him. He asked what was the matter, and the mate replied, that Hutson had been striking the second mate, and that he had been taking him to do for it; that he then told Osgood (the mate) to take the man forward and set him at work, and that if he ever lifted his hand against an officer again, to let him know it, and he would correct him." The cook, who was the only witness to this part of the affair, gives a different account from that of either the libellant or the master. He says, that when Hutson called on the master, though he called with a very loud voice, he gave no answer and took no notice of it, and that the assault was still continued by the mate. If the witness is to be credited, even without referring to the master's answer, it can hardly be doubted, but that he must have heard repeated and loud calls upon him, and there can be as little

doubt, but that it was his duty to interpose and arrest the violence of the mate. But the statement of the witness, and that of the master, as to the material point, are in direct contradiction. Which is to be believed?

This presents a question of great importance in practice, namely, how far the answer is evidence. The libel is sworn to, and it calls for the answer of the respondent on oath. It is stated in a recent and valuable work on the practice of the admiralty, that when the libellant calls for the answer of the respondent on oath, the answer has the same effect as evidence, with an answer in chancery; and is to be received as true, so far as it is responsive to the bill, unless contradicted by two witnesses, or one witness with strong corroborating circumstances. Dunl. Adm. Prac. p. 122. It is admitted, that the rule in chancery is as it is stated. It is there understood to be a positive rule binding on the court. A decree cannot be made against the positive denial in the answer of any matter charged in the bill, unless it is overborne by two witnesses, or one witness whose testimony is corroborated by circumstances proved by other evidence. Hughes v. Blake, 6 Wheat. [19 U. S.] 453; Mortimer v. Orchard, 2 Ves. Jr. 243; Biddulph v. St. John, 2 Schoales & L. 532.

But has this principle been adopted, as a rule of jurisprudence, by courts of admiralty? Two cases only are referred to in support of it, that of Teasdale v. The Rambler [Case No. 13,-815], and U. S. v. The Matilda [Id. 15,741]. The latter case was before Chief Justice Marshall, in the circuit court, and it is to be remembered was not on the instance side of the court, but was a case of prize. The practice of the prize court is different from that of the admiralty, acting as an instance court, in the exercise of its ordinary jurisdiction. And again, the doctrine is not stated directly by the chief justice, but is merely an inference from what he does say. It was argued by counsel, that the answer in that case should be received as evidence, like an answer in chancery. The report, which is very brief, then goes on to say, that the "chief justice admitted the rule in chancery, as to the negative matter in the answer, but not in a case where it asserts a right affirmatively, in opposition to the complainant's demand; but he took this distinction between the case in chancery and in admiralty; in the former, the complainant calls upon the defendant to purge his conscience and disclose facts; by this appeal to his conscience, the complainant makes the answer evidence; in the latter no such demand or appeal is made." U. S. v. The Matilda [supra]. It is a matter of inference only from this case, if the answer is called for on oath, that it is evidence to the same extent as an answer in chancery. Judge Bee does, indeed, state the principle more explicitly. He says, that "the actor in civil law courts, and the complainant in chancery, is entitled to call for the oath of the defendant, because it is otherwise difficult to get at the knowledge of the facts. To counteract this oath there must be two witnesses." If it is intended to be said, that the Roman law gives this effect to the answer of the party, it is a mistake into which the learned judge was led for the moment, probably, by confounding the decisory oath with an answer to interrogatories; for it is certain that the Roman law does not give this effect to such answers.

Now, if there was any such established rule of jurisprudence in the admiralty, it is to say the least, surprising, that it should be nowhere met with, or explicitly declared and laid down, as a known rule of decision, as it is found in almost every volume of equity reports; that no instance in point should have occurred in all our admiralty courts, where it was the very turning point of the cause, as it frequently is in equity; that the only evidence, that can be found existing of so important a rule of jurisprudence, and one of which the application must be of such frequent occurrence, is two obiter dicta, where it is just mentioned, and that in connection with the familiar and well-known rule in chancery. Nor is it a legitimate inference, that, because a certain effect is given to an answer in chancery, the same must be allowed to an answer in admiralty. Not to insist on the fact, that the course of proceeding in the two courts is different in many respects, it is more material to be remarked, that their rules and principles of practice are derived from different sources; those in equity being derived from the canon law, through the English ecclesiastical courts, modified, it is true, from time to time, by the court itself, while the general rules of practice in admiralty come to us directly from the Roman law. 4 Bl. Comm. 446; 2 Browne, Civ. Law, p. 348. The form of the libel and answer, the securities, or stipulations, taken to enforce the jurisdiction of the court, the interrogatories put to the parties, in the progress of the trial, after the pleadings are completed, the method of proceeding by defaults and successive decrees, are all so far as my information extends, which I admit is limited, derived directly from the practice of the Roman forum, or from that practice as it is modified by the usages of civil law courts in modern times. There is nothing analogous to a good deal of this in the proceedings of a court of equity, but what is most material to the question under consideration, the practice of the civil law courts, by which the parties may extract evidence from each other, by interrogatories put at the hearing of the cause, is entirely different from the practice of courts of equity.

By the Roman law, both parties were obliged to verify their causes by oath; that is, the actor was obliged to swear to the de-

mand on which the libel was brought, and the defendant that the defence was made in good faith, was in his belief true and a good defence to the action. In the brief and comprehensive form of pleading in the Roman forum, the oaths of the parties amounted in substance to the actor's swearing to the libel, and the defendant's swearing to his answer. And such, notwithstanding the doubts expressed on the subject, I have supposed to have been always the practice of the admiralty. The libellant is required to verify the debt or claim, on which the action is founded, by his oath, before he is entitled to take out process against the party. Our practice differs in some respects from that of the high court of admiralty of England. There, the first step taken in a cause is to enter the action and take out a citation or a warrant of arrest, and the libel is filed on the return of process. But the libellant is required to verify the debt, when the action is entered. Clerke, Praxis Adm. tits. 1, 11, 19; 2 Browne, Civ. Law, 397, 410, note; Dunl. Adm. Prac. c. 3, p. 111. It appears from title 4, Clerke, Praxis Adm. that the pleadings, in ancient times, were viva voce. It may, perhaps, be inferred from Clerke, Praxis Adm. tit. 12, that formerly process was issued without the oath of the party to the debt, but the oath was required on the suggestion of the defendant, that the action was for a larger sum than was due. But whatever may have been the former practice, it is now according to Browne, required before process is issued. In our courts, the libel is filed in the first instance. If it is on a contract, as for wages, the account is usually annexed to the libel and sworn to as a debt due, or the libellant swears to his libel. If it be for a tort, the libel should be verified by the oath of the party. The affidavit required of the libellant to the debt or claim, on which the action is brought, corresponds to the oath of calumny required of the actor by the Roman law: "Quod non calumniandi animo litem se movisse, sed existimando bonam causam habere." Inst. 4, 16, 1, C 2, 59, 2.

Dunlap, in his Admiralty Practice, says, that "in the admiralty courts of the United States, although it is usual, it is not generally understood to be necessary, that the libel should in the first instance be supported by the oath of the libellant. This however, he adds, depends on the rules of the different courts. In the district of Massachusetts, libels are usually signed by the proctor, without being sworn to, unless process of arrest of persons or property is prayed for." Dunl. Adm. Prac. p. 126. There may be little inconvenience in issuing a citation merely, where no arrest is asked for, without the affidavit of the party, because on the appearance the omission may be cured, on motion of the adverse party, upon pain of the libel being dismissed with costs. Though it may not be necessary in all cases, that the libel should be formally sworn to, it is necessary, I apprehend, in correct practice, that the debt, or cause of action, on which the libel is filed, should be verified by affidavit, as a good and subsisting cause of action. At least such has always been the practice in this district, since I have been acquainted with it. Cases may have occurred, which have passed without notice, when it has been omitted, but whenever it has been asked for, the rule has invariably been enforced. It has been considered as a positive rule, which the court in ordinary cases, was not authorized to dispense with. Cases have happened, in which, in the absence of the party, the oath of his agent or attorney, has been admitted from necessity; but the verification of the debt by oath has been always held to be indispensable, when it was insisted upon. The practice in this district has been in conformity with that of the court of New York. By the first rule of the district court of New York, all libels are required to be sworn to, except where the United States is a party; and by the eleventh rule of the circuit court, when new allegations are made on appeal, they are required to be put in under the oath of the party. Id. Append. p. 355.

It is also in conformity with the form given in our books of practice, and this, in a matter of mere practice, will be admitted to be of no inconsiderable authority. It may be added, that in the excellent collection of precedents added to Mr. Dunlap's work by the learned editor, which are as remarkable for their accuracy, as for their neatness and comprehensive brevity, and have evidently been prepared with great care, the libels and answers are all verified by oath. The practice of the admiralty, and in this also it follows the Roman law, equally requires the defendant to verify his answer by his oath. Clerke, Praxis Adm. tit. 24; Gammell v. Skinner [Case No. 5,210]. "Reus non aliter suis allegationibus utatur, nisi prius juraverit, quod putans se bona instantia uti, ad reluctandum pervenerit." Inst. 4, 16, 1; Code, 2, 59, 2.

Such being the practice, the question presents itself, how far the answer denying any of the allegations of the libel, is evidence for the respondent. In the Roman law, the oath of the party to the debt, or to the defence, was no more evidence for him, than the affidavit of debt required of a plaintiff by a court of common law, to hold the defendant to bail. If the answer of the respondent is evidence in his favor, why is not the allegation of the libellant evidence for the libellant, as it is equally under oath? In the courts of law and equity where the affidavit of a party is required, the same credit is given to the oath of the plaintiff as to that of the defendant. Neither one nor

the other, as I have understood the practice of the admiralty, is it the strict and proper sense of the word, "testimony." But where they contain as they do in the admiralty, a particular statement of the cause of action, and of the ground of defence, with all their circumstances, they are not considered as they would be, if the cause of action were set forth in a fixed and established formula, as, for instance, like a declaration in trover at common law, and the answer was nothing more than a general denial. They are the statement of the parties themselves of their case, under the solemnities of an oath, and are to be considered as such. They form part of the record of the case, and though not strictly testimony, they are certainly not to be regarded as a mere formal statement of the cause of action and ground of defence. The answer is carefully to be compared with the allegations of the libel, and with the proofs and the testimony in the case; and the degree of credit, to which it is entitled, must depend on the result of that comparison. When the answer is carefully drawn, and it appears from comparing it with the facts proved in the case by disinterested witnesses, that the party has stated his case fairly, or with no more than that bias which one naturally feels towards his own cause, and with no more coloring than an upright man may insensibly give to facts, in which his interest and feelings are involved, the statement of the party himself may justly have a material influence on the mind, in coming to a final result. But whether the answer is to be treated as the statement of the party, or whether it be received as the testimony of an interested witness, and treated as constituting a part of the proofs of the case, I know of no technical rule in the admiralty, like that in equity, which binds the conscience of the court, and undertakes to determine the precise degree of credit, to which it is in all cases entitled. It is to have that weight, to which, in addressing itself to the judgment of the court, it is fairly entitled. If it be said, that this is giving no rule, the answer is, that the nature of the case does not admit of any precise rule. And it may be asked, by what rule of law, or jurisprudence, we are authorized to believe one disinterested witness in preference to another? And yet who ever had a cause to decide, either as a judge or a juror, who has not felt himself bound in conscience to give more credit to one witness than another, though they may have had equal opportunities of knowledge. One is more observing, has a more accurate and retentive memory, is more intelligent, is more free from bias and prejudice; he is a ready, or he is a reluctant witness, and yet by what technical or arbitrary rule are we to mark the precise distinction, when the cases vary from each other by imperceptible shades of difference? It is a matter, that can only be referred to the sound discretion and conscience of the tribunal, which has the cause to decide.[2]

To apply these principles to the present case. The witness, says that the libellant, repeatedly, while at the companion-way, called with a loud voice on the master, to protect him from the violence of the mate; that he made no answer, and suffered the mate to continue the assault. The answer of the master is in direct contradiction to the witness. Whether the allegation of the answer is to be received as the testimony of a witness, or treated as the sworn statement of a party, it is at best but the testimony of an interested witness, swearing to his own discharge, and on common principles it would be entitled to less credit, than the testimony of a witness, who has no interest in the cause. But the account of the witness is also in opposition to the allegation of the libel. The libellant himself states, that the master did answer, and order the mate to take him forward and flog him. As both the parties contradict the witness, the reasonable conclusion is, that in this particular he is mistaken, and as the allegation of the libel is denied in the answer, and this denial is not overcome by proof, the master must stand acquitted.

As to the mate, although the assault was without any sufficient provocation at the time, I do not think it a case which calls for exemplary damages. It is in proof, that the libellant imposed himself on the master as an able seaman, when he was at best but an ordinary seaman. But this will not justify corporal punishment. The proper corrective, as was said at the argument, is diminished compensation. But he was not only inapt, he was slow, reluctant, and careless in the performance of his duty, and in his general deportment, wanting in a proper respect to the officers of the ship. Had the punishment been inflicted by the master, this might have been held, as in a case somewhat similar, it was, by Lord Stowell, to be a justification. The Lowther Castle, 1 Hagg. Adm. 384. But it is no justification for the mate. But this habit and continued course of conduct did operate as a continued provocation to the officers of the ship, and without being allowed as a justification for

[2] This is the first case that we remember in which the question, what is the precise effect of an answer in admiralty, has been discussed at any considerable length. The subject was again presented in the case of The Crusader [Case No. 3,456], and it arose in Sherwood v. Hall [Id. 12,777]; in Cushman v. Ryan [Id. 3,515]; and in Jay v. Almy [Id. 7,236],—but in neither did the court undertake to say what precise effect is to be allowed to it as evidence further than that the rule in equity, that the answer must prevail unless overcome by more than the testimony of a single witness, does not apply in the admiralty. Mr. Greenleaf, in his treatise on the Law of Evidence, gives the rule substantially as it is stated in this case.

so severe a beating, it may justly be considered in mitigation of damages. I decree thirty-five dollars damages against the mate with costs, and dismiss the libel as against the master.

NOTE. As the forms and modes of proceeding in the admiralty are derived principally from the Roman law, some light may be thrown on the question discussed in the above case, by a more extended account of the practice of the civil law courts in relation to the same matters. In all countries, and under all systems of jurisprudence, it has been found necessary to establish some check to causeless and vexatious litigation. In the jurisprudence of the common law, the principal check is the liability to costs. But in the jurisprudence of ancient Rome, it appears that a party was not liable for the costs of the adverse party, merely because judgment was rendered against him. He was liable only when he instituted an action without probable cause; that is, when the suit was vexatious, or, in the language of the Roman law, calumnious; and then costs were not given against him, as part of the judgment, but could be recovered only by a new action called an action of calumny, corresponding to an action for a malicious suit at common law. By this action, the party could recover ordinarily a tenth, but in some cases a fifth and even a fourth of the sum in controversy in the former action. This was given as an indemnity for his expenses, in being obliged to defend himself against a vexatious suit. Gaii. Comm. lib. 4, §§ 175–178; Inst. 4, 16, 1; Vinn. in loc.

In the time of Justinian, and perhaps at an earlier period, the action of calumny had fallen into desuetude, and he, as a substitute, required the oath of calumny. The oath required was in substance an affidavit on the part of the actor, that the debt or cause of action, on which the suit was brought, was in his opinion well founded, and on the part of the defendant, that the defence was made in good faith and in the belief that it was a good defence. "Actor quidem juret, non calumniandi animo litem se movisse, sed existimando bonam causam habere; reus autem non aliter suis allegationibus utatur, nisi prius et ipse juraverit, quod putans se bona instantia uti, ad reluctandum pervenerit. Code, 2, 59, 2; Vinn. in Inst. 4, 16, 1; 1 Huber. Praelect. Jur. Civ. l. 4, 16, 1." But these affidavits were not evidence in the cause. They were required solely and professedly as a check to vexatious litigation. But the oath of calumny, though not evidence, was an essential part of the proceedings in the cause. It was ordered by Justinian to be officially required by the judge, although not insisted upon by the parties, and if omitted, it vitiated the whole proceedings. Gail, Pract. Obs. l. 1; Obs. 23, 1, 90, 1; 1 Huber, Praelect. l. 4, 16, 2. The practice of requiring the oath of calumny appears to be preserved generally in the civil law courts of the continent of Europe. It is not, however, observed in France, and Dupin condemns it as conducing more to perjury than to the prevention of litigation, which he says, is more effectually checked by a liability for costs. Heinn. Recitationes (Dupin's Ed.) 4, 16, 1.

Another part of the Roman jurisprudence, from which our admiralty practice has been in part derived, is the interrogatory actions of the Roman law. These were derived from the edict of the praetor, and constituted a part of that large portion of the law of Rome called "Jus Praetorium," or "Jus Honorarium." The reason of the introduction of these actions was this. If the actor demanded in his action more than was his due, he failed in his whole demand; judgment was rendered against him, and if he failed for this cause, it was with difficulty that he could be restored to his rights in integrum. Gaii, Comm. 4, 53; Inst. 4, 6, 33. As he could not in all cases know the precise extent of his rights, or rather of the defendant's liability, that is, whether he was liable for his whole demand, in solido, or for a part, as if the action was against him in his quality of heir, whether he succeeded to the whole inheritance or to a part (Dig. 11, 1, 1, §§ 2, 3), this action was allowed by the praetor, in the nature of a bill of discovery to compel a disclosure, for the purpose of enabling the actor to make his claim to correspond precisely with his right and with the defendant's liability. Brown says, that these actions "were confined to a few cases and were introduced to discover to what part of the 'as,' or inheritance, the defendant was entitled." Though this seems to have been the principal object of their introduction (Dig. 11, 1, 21), and there might be more frequent occasion for their use in these cases than in others, it is clear, from the whole title of the Digest, where they are treated, that they were not confined to them, but might be resorted to in all cases, where the actor required a discovery: "Ubicunque judicem aequitas moverit, aeque oportere fieri interrogationem, dubium non est." Code, 3; 10, 2; Inst. 4, 6, 33.

By a constitution of the Emperor Zeno, the law de pluris petitione, by which the actor failed if he demanded too much, was abolished (Dig. 11, 1, 2), and by the time of Justinian, if not at an earlier period, these interrogatory actions had fallen into disuse, as we learn from a fragment of Callistratus preserved in the Digest. A new practice arose of putting the interrogatories after contestation of suit, and the answers thus obtained, instead of furnishing the grounds for the commencement of an action, became evidence in the case for the adverse party. This appears from the law referred to above: "Ad probationes sufficiunt ea, quae ab adversa parte expressa fuerint. Dig. 11, 1, 1, 1." The general practice of the courts, which have adopted the forms and modes of proceeding of the Roman law, of requiring the parties to answer interrogatories under oath, called positions and articles, or facts and articles, seems to be derived through this law of the Digest and the later practice of the Roman forum, from the ancient interrogatory action; although Heineccius has expressed a contrary opinion. Ad. Pand. Pars. 2, note 245.

The clause of the law in question is generally supposed to be an interpolation of Tribonian in the text of Callistratus, and considered as the introduction of a new practice. It is so viewed by Pothier, and in his edition of the Pandects it is called jus novum. L. 11, 1, 24. Voet, however, seems to think, that there is evidence of a change in the practice, as early as the age of Ulpian, who was contemporary with Callistratus. Ad. Pand. 11, 1, 4; Dig. 11, 6, 25. But at whatever period the change took place, whether in the age of Ulpian or Tribonian, it has passed with various modifications into the practice of the courts of all nations, which have adopted the Roman law as the basis of their jurisprudence. Gail. Pract. Obs. l. 1, Obs. 79, 82; Huber. Praelect. vol. 2, l. 11, 1, b; Poth. Procedure Civile, pt. 1, ch. 3, art. 5; Voet, ad Pand. 11, 1, 4. Either party may interrogate the other as to any matters of fact, which may be necessary to support the action or maintain the defence, and the party interrogated is bound to answer, unless his answer will implicate him in a crime. The answer is evidence against himself, but not to affect the rights of third persons. Voet, ad Pand. 11, 1, 4, §§ 5, 10; Toull. Droit Civil Francais, vol. 10, n. 274; Code de Procedure Civile Francais, tit. 15. This appears to be the usual mode in which parties extract evidence from each other. But modern practice has introduced another innovation, and has authorized, for the purpose of expediting causes, the introduction substantially of the positions and articles into the libel itself, although regularly they cannot, in the form of positions and articles, be propounded until after contestation

of suit, and of course not until after the answer is in. A libel in this form is said to be an articulated libel or a libel in articles. Gail, l. 1, Obs. 79, 3, 4. The evidence sought for is then obtained in the answer. It is a special answer to each article in the libel; and the litis contestatio, when the pleadings are in this form, is said to be special and particular, in contradistinction to a simple libel, and a general answer amounting to the general issue. An issue is formed on each article. Heinn. ad Pand. Pars. 2, note 42. From this account, it is apparent, that the practice of the admiralty, so far as relates to the libel and answer, is in its forms identical with that of the Roman law. As in the Roman law, so in the admiralty, the parties are required to verify the cause of action and the defence by oath; the libel may either be simple or articulated, and the answer must correspond with it; either party also may require the other to answer interrogatories on oath, touching any matters which may be necessary to support the libel or the answer.

We have seen, that the oath of calumny, or the general verification of the cause of action and ground of defence, was not evidence for either party. How far are the answers to interrogatories on positions and articles held to be evidence by courts of the civil law? It has been before stated, that this practice of interrogating a party after contestation of suit was derived from the interrogatory actions, and took their place, when they fell into disuse. The answers of the defendant in these actions were evidence against him but not in his favor. The object of the action was to extract from the party facts, the knowledge of which was confined to himself, or which were difficult to be proved except by his own admission, and without which the actor could not safely commence his action. If he answered truly, he was responsible according to his actual legal liability; but if he answered falsely, by denying his liability altogether, or by alleging it to be less than it was in fact, unless he could show that it was by an honest mistake, he was held liable for the whole demand: "Ut vel confitendo vel mentiendo sese oneret. Dig. 11, 1, 4; Dig. 11, 1, 11, § 3."

The late period in the progress of Roman jurisprudence, at which this innovation on the ancient practice took place, is the reason why we find so little relating to it in the corpus juris. The natural presumption would be, that the answers would be held to be evidence to the same extent, that the answers to interrogatory actions were, for which they were a substitute. And this seems to be a clear inference from the words of the law, whether they are to be considered as the words of Callistratus or of Tribonian: "Ad probationes litigatoribus sufficiunt ea quae ab adversa parte expressa fuerint apud judices, vel in hereditatibus vel in aliis rebus quae in causis vertuntur. Dig. 11, 1, 1, § 1."

The civilians teach us accordingly, that the interrogatories, on positions and articles, are subject to the same rules and are governed by the same principles, as the interrogatory actions. 2 Huber, Praelect. L. 11, 1, 9; Voet ad Pand. 11, 1, 2. Pothier states the doctrine and explains the reasons of it with his customary clearness. "When a party," says he, "proposes facts and articles, upon which he obtains an order, that the opposite party shall be interrogated by the judge, the oath which is taken on such interrogatories is very different from the decisory oath. While the decisory oath is proof for him who makes it, this on the contrary, is no proof in favor of the party who makes it; the answers which the party interrogated makes are proof only against him; they prove nothing in his favor. The reason of the difference is, that he, who causes the party to be interrogated, does it not with the intention of having the decision depend on his answers, but he puts him to answer, in order to draw from the avowals of the party, or from the contradictions into which he may fall, some proofs or presumptions in his favor: "Ut vel confitendo vel mentiendo sese oneret. Pothier, des Obl. note 910; Traite de Procedure Civile, pt. 1, c. 3, art. 5, § 5." The answer cannot be divided; the whole must be taken together or the whole rejected. It seems, however, that when a series of articles is propounded, the answer to each article is distinct and independent, and may be taken by itself; and the party making use of one is not bound to admit the rest. Repertoire de Jurisprudence, art. Chose Juge, § 15; Questions de Droit, Confession, § 2. In the admiralty practice in this country, it is believed, that when a party is required to answer special interrogatories, put at the hearing, the answers are evidence as well for the party who is interrogated, as for the other party. The practice in this district has been to allow a party to put to his adversary such questions as he pleases, but he does it at the hazard of rendering his answers evidence in the cause.